UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PAULA MELVILLE, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-30051-MAP |
| | ) | |
| TOWN OF ADAMS, by and through | ) | |
| MICHAEL OUELLETTE, ARTHUR | ) | |
| HARRINGTON, JASON HNATONKO, | ) | |
| SCOTT NICHOLS, individually and as | ) | |
| they comprise the Town of Adams | ) | |
| Board of Selectmen, JONATHAN | ) | |
| BUTLER, individually and in his capacity | ) | |
| as Adams Town Administrator, ERICA | ) | |
| SAMSON, individually and in her | ) | |
| capacity as Director of the Council on | ) | |
| Aging of the Town of Adams, DONALD | ) | |
| POIROT, individually and in his | ) | |
| capacity as Chief of Police of the Town | ) | |
| of Adams, MIRICK, O'CONNELL, | ) | |
| DEMALLI & LOUGEE, LLP, by and | ) | |
| through COREY HIGGINS and | ) | |
| DEMITRIOS MOSCHOS, individually | ) | |
| and in their capacity as Special Counsel | ) | |
| to the Town of Adams, AFSCME | ) | |
| COUNSEL 93, ALF-CIO, by and through | ) | |
| NADINE KENNEDY, individually and in | ) | |
| her capacity as STAFF | ) | |
| REPRESENTATIVE to the Clerical Unit | ) | |
| of the Town of Adams, | ) | |
| COMMONWEALTH OF | ) | |
| MASSACHUSETTS OFFICE OF THE | ) | |
| ATTORNEY GENERAL, by and through | ) | |
| JONATHAN SCLARSIC, individually and | ) | |
| In his capacity as Assistant Attorney | ) | |
| General of the Massachusetts Office of | ) | |
| Attorney General, BERKSHIRE | ) | |
| COUNTY SHERIFF'S OFFICE, by and | ) | |
| Through RONALD CLARK, individually | ) | |
| and in his capacity as Process Server of | ) | |
| the CIVIL PROCESS DIVISION of the | ) | |
| Berkshire County Sheriff's Office, | ) | |
| Defendants | ) | |

REPORT AND RECOMMENDATION WITH REGARD TO
DEFENDANTS' MOTIONS TO DISMISS
(Document Nos. 11, 13, 18, 30, 35, and 52)
January 10, 2013

NEIMAN, U.S.M.J.

In this action, Paula Melville ("Plaintiff"), proceeding *pro se*, asserts a number of
claims stemming from her time as a member of the Town of Adams Board of
Selectmen.  Most notably, her claims arise from orders entered by the Board of
Selectmen (hereinafter, "the Board") prohibiting her from entering town property and
speaking with Town employees.  In particular, Plaintiff's twenty-one count complaint
asserts the following sets of claims: due process, violation of the Massachusetts Open
Meeting Law, retaliation, whistleblower, defamation, violation of the code of professional
conduct, First Amendment, equal protection, and false light.  Named as defendants are
the Town of Adams; Michael Ouellette, the chair of the Board; Arthur Harrington, Jason
Hnatonko, and Scott Nichols, all member of the Board; Jonathan Butler, the Adams
Town Administrator; Erica Samson, the Director of the Adams Council on Aging; Donald
Poirot, the Adams Chief of Police; Mirick, O'Connell, Demallie & Lougee, LLP, a law firm
hired by the Town of Adams as Special Counsel; Corey Higgins, an attorney with Mirick,
O'Connell, Demallie, Lougee, LLP; Demitrios Moschos, an attorney with Mirick,
O'Connell, Demallie, Lougee, LLP; AFSCME Council 93, a labor union which represents
Adams municipal employees; Nadine Kennedy, a Staff Representative to Adams
Clerical Unit Local #204 of AFSCME; the Commonwealth of Massachusetts Office of
the Attorney General; Jonathan Sclarsic, an Assistant Attorney General; the Berkshire

County Sheriff's Office; and Ronald Clark, a Process Server in the Berkshire County Sheriff's Office (together, "Defendants").

Among them, Defendants have filed six motions to dismiss, which, if granted, would dismiss all of Plaintiff's claims. The motions have been referred to this court by District Judge Michael A. Ponsor for a Report and Recommendation. *See* 28 U.S.C. § 636(b)(1)(B). For the following reasons, the court will recommend that Defendants' motions be granted in part and denied in part.

## I. STANDARD OF REVIEW

When faced with a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted, the court must accept the allegations in the complaint as true, drawing all reasonable inferences in favor of the plaintiff. *See Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Coyne v. City of Somerville*, 972 F.2d 440, 443 (1st Cir. 1992). Although "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" *Sepulveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 28 (1st Cir. 2010), the Supreme Court made clear under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), that only a complaint that states a plausible claim for relief on its face will survive a motion to dismiss. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009). The Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949. Still, a *pro se* plaintiff is "entitled to liberal construction of his

allegations, no matter how inartfully pled." *Stern v. Haddad Dealerships of the Berkshires, Inc.*, 477 F. Supp. 2d 318, 321 (D. Mass. 2007).

## II. BACKGROUND

The following facts come from Plaintiff's complaint and the numerous attachments thereto.  The facts and all reasonable inferences are stated in a light most favorable to Plaintiff as the party opposing dismissal.  *Young v. Lepone*, 305 F.3d 1, 8 (1st Cir. 2002).

On May 3, 2010, Plaintiff was elected to the Board for a three-year term. (Complaint ("Compl.") ¶ 25.)  Following her election, Plaintiff clashed with the other four members of the Board, Michael Ouellette, Arthur Harrington, Jason Hnatonko and Scott Nichols, over a number of issues, as reflected in various newspaper articles.  (Compl. ¶¶ 26-29, 31; Exhibits B, C, D, and F (attached to Compl.).)  For example, some Board members were upset after learning that Plaintiff, without the consent or knowledge of the rest of the Board, had contacted state officials to request an accounting of state spending on a project.  (Compl. ¶ 26; Exhibit B (attached to Compl.).)  Plaintiff also clashed with Board members and the Town Administrator, Jonathan Butler, over communications with town employees and the proper role of the Board *vis a vis* the Town Administrator.  (Exhibits B and F (attached to Compl.).)  At a Board meeting on February 16, 2011, Plaintiff brought up this governance issue, stating that "what we need to understand is that the Board of Selectmen is in charge . . . and that the administrator serves us."  (Exhibit F (attached to Compl.).)  According to a newspaper article, however, Oullette "compared the town's organization as being similar to a company like GE.  The board of directors set policy but the chief executive officer runs

the business and reports back to the whole board." (Id.) The article also reported that

at the meeting "Selectmen Arthur 'Skip' Harrington and Jason Hnatonko both expressed

annoyance that a board member was going rogue – writing letter to agencies and

demanding information as a representative of the town, trying to micromanage certain

departments and failing to communicate appropriately with the town administrator. It

was obvious they were talking about [Plaintiff]." (Id.)

On February 25, 2011, Plaintiff received a copy of the Town Administrator's

recommended town operating budget for fiscal year 2012. (Compl. ¶ 36.) Apparently,

the budget proposed eliminating the Adams Council on Aging social day program and

one or more town employee positions at the Council on Aging. (Id. ¶ 37; Exhibit X

(attached to Compl.).) On February 28, 2011, Plaintiff visited the Council on Aging and

"made separate brief comments about the Adams Town Administrator's recommended

FY2012 budget to three employees of the Adams Council on Aging: the part-time

Administrative Assistant, the Director, and one of the Town staff members of the

Council's social day program." (Id. ¶ 38.)[1]

---

[1] It is not entirely clear what Plaintiff said to these individuals. In a complaint
Plaintiff filed with the Office of the Attorney General, which she attached to her
complaint in this action, she alleged that she "asked the part-time staff member whether
she had seen the proposed town budget. She answered no. [Plaintiff] told her, 'You
won't be happy. I know I'm not.' . . . To the full-time staff, [Plaintiff] said that sweeping
changes are recommended in the budget and that she found them totally
unacceptable." (Exhibit X (attached to Compl.).) Samson, the Direct of the Council on
Aging, gave a different account, which Plaintiff also attached to her complaint. (Compl.
¶ 67; Exhibit Q (attached to Compl.).) According to Samson, Plaintiff asked her whether
she had ever dated Butler, disclosed "confidential information" from the proposed
budget to the administrative assistant and stated that "her position had been cut," and
informed another employee that the supportive day program "was going to be cut and
he would be losing his job." (Exhibit Q (attached to Compl.).) Plaintiff appears to deny
that she revealed confidential information about the proposed budget or told town

At some point on February 28, 2011, Plaintiff went to the Adams Prudential Committee, where she saw Butler, the Town Administrator, and Harrington, another Board member.  (Id. ¶ 33.)  After Butler authorized the use of "Forest Warden's property," Plaintiff "interrupted the meeting and informed the Prudential Committee that Butler and Harrington were not authorized to be at the meeting, nor did they have the authority to offer use of Forest Warden's property."  (Id.)

At approximately 4:30 p.m. that same day, Plaintiff received written notice of an emergency meeting of the Board, scheduled for 6:30 p.m.  (Id. ¶ 39.)  The notice was delivered by Ronald Clark, a member of the Civil Process Division of the Berkshire County Sheriff's Office.  (Id ¶¶ 39, 99.)  The single item on the notice was "Discussion of Charges/ Allegations concerning [Plaintiff]."  (Id. ¶ 39.)  Plaintiff alleges that the general practice of the Board, "when dealing with sensitive issues of a personal, health, or financial nature of an individual," would be to go into executive session rather than publicizing the individual's name in the meeting agenda.  (Id. ¶ 41.)

During the emergency meeting, which Plaintiff did not attend, the other four Board members, in unanimous votes, affirmed four "orders" against her.  (Id. ¶ 42.)  The first order stated that Plaintiff "made comments to members of the Clerical bargaining unit (Local #204), Council 93, AFL-CIO outside the presence of a representative from AFSCME that could be viewed as constituting direct or self-dealing (or at least the appearance of direct or self-dealing) in violation of M.G.L. c. 150E"; it also stated that the Board disavowed any such comments made by Plaintiff.  (Exhibit J (attached to

employees that they would be losing their jobs.  (Compl. ¶ 120) For present purposes, therefore, the court will take Plaintiff's account, and not Samson's, as true.

Compl.).)  The second order stated that "the Board has determined that [Plaintiff] interfered with the Town's administration by inappropriately discussing Town business with Town Department Heads and Town employees during business hours" and ordered Plaintiff "to not discuss Town business directly with Town Department Heads or any other Town employees . . . at any time without the permission of the Town Administrator."  (Id.)  The third order stated that Plaintiff "released confidential information in her possession as a member of the Board of Selectmen to members of a collective bargaining unit in violation of M.G.L. c. 268A, § 23(c)(2) and M.G.L. c. 150E"; it also stated that the Board decided to refer Plaintiff's "unauthorized release of confidential information . . . to the State Ethics Commission for review."  (Id.)[2]  The fourth order prohibited Plaintiff from "enter[ing] upon Town Department premises without the express prior permission of the Town Administrator" but exempted "public areas of Town Hall, the Police Station, the Adams Free Library, . . . the Town of Adams' Parks and Recreation Department, [and] the Board of Selectmen's Chambers."  (Id.)

Later that day, at approximately 10:00 p.m., copies of the four orders were posted electronically to iBerskshires.com, a news website which covers Berkshire County.  (Compl. ¶ 43.)  The next day, March 1, 2011, Plaintiff found signed copies of the four orders in a Berkshire County Sheriff's envelope behind her mail basket on March 1, 2011.  (Id. ¶ 44.)  Corey Higgins and Demitrios Moschos, attorneys with the law firm Mirick, O'Connell, Demallie & Lougee, LLP, provided advice and assisted the Board in drafting the orders; the firm was paid $1,300.00 for its services.  (Id. ¶¶ 64-66.)

---

[2] The Massachusetts State Ethics Commission never contacted Plaintiff regarding this matter.  (Compl. ¶ 52.)

In a March 1, 2011 newspaper article, Donald Poirot, the Adams Chief of Police, stated that, "while he would like a legal opinion from counsel first, he thinks the Board's vote [of February 28, 2011] counts as an order of no trespass which can be enforced by a police officer through either asking the person to leave or placing them under arrest." (Id. ¶ 56; Exhibit L (attached to Compl.).)  Thereafter, between March and September of 2011, Town employees refused to speak with Plaintiff on numerous occasions when she attempted to do so.  (Compl. ¶¶ 57, 59-60.)  In July of 2011, for example, Plaintiff went to the Adams Department of Public Works ("DPW") to report water overflowing from a manhole.  (Id. ¶ 59.)  A DPW employee who was outside saw Plaintiff and rushed into the building, after which the Shift Supervisor came out to take Plaintiff's information but blocked her entry into the DPW building.  (Id.)  In May of 2011, Plaintiff later learned that Town department heads had received an e-mail from Butler, the Town Administrator, directing them not to respond to Plaintiff.  (Id. ¶ 58.)

On March 2, 2011, the Board voted to approve changes to the its Policy Guidelines Handbook.  Prior to the change, a portion of the Handbook read as follows:

> A member of the Board of Selectmen, in his or her relations with Town staff, should . . . .  Limit contact with specific Town staff.  Questions of Town Staff and/or requests for additional background information should be directed only to the Town Administrator, Town Counsel, Administrative Assistant to the Board of Selectmen, or Department heads.  The office of the Town Administrator should be copied on all requests or correspondence.

(Compl. ¶ 90.)  After the change, that portion of the Handbook stated:

> A member of the Board of Selectmen, in his or her relations with Town staff, shall . . . .  Limit questions of Town staff to those of a general nature.  Specific questions requiring detailed information or written documentation shall be directed only to the Town Administrator.  It shall be the Town Administrator's responsibility to direct his staff to provide the requested information, or otherwise seek direction from the Board.

8

(Compl. ¶ 89.)

On March 3, 2011, prior to an executive session of the Board, which Plaintiff did not attend, Plaintiff received Samson's written account of the events that occurred at the Council on Aging on February 28, 2011.  (Id. ¶ 67; Exhibit Q (attached to Compl.).)  In addition to Samson's account, Nadine Kennedy, a Staff Representative of AFSCME Council 93, wrote in a letter to Higgins, a counsel to the Town, that Plaintiff had "approached AFSCME members employed in the Adams Council on Aging and announced that they were going to be laid off."  (Compl. ¶ 69; Exhibit T (attached to Compl.).)  Kennedy also stated that "[t]he Union would have had no choice but to file a Charge of Prohibited Practice with the Division of Labor Relations" if not for the actions of the Board to "immediately . . . disavow the actions taken by [Plaintiff]."  (Exhibit T (attached to Compl.).)  Ouellette read aloud Kennedy's letter on March 16, 2011, during a regular Board meeting which was broadcast live over local community television.  (Compl. ¶ 83.)

On March 6, 2011, Plaintiff wrote to Ouellette seeking the following information: (1) the legal basis under which the Board heard testimony and entered orders against her; (2) a review of whether the Town Administrator had acted impartially and fairly with respect to her; (3) the collective bargaining agreements that were allegedly violated and the facts supporting the allegation; (4) the legal basis for the allegation that the proposed budget was confidential; (5) the statements of the Council on Aging employees regarding her conversations with them on February 28, 2011; and (6) information regarding how the Board decided to hold the emergency meeting on

February 28, 2011.  (Exhibit R (attached to Compl.).)  On April 5, 2011, Ouellette, on behalf of the Board, sent Plaintiff detailed responses to her written inquiries.  (Exhibit S (attached to Compl.).)  Ouellette explained the following.  First, the Board and the Town Administrator had acted under the authority of the Town Charter.  As to the legal basis for hearing testimony from Samson, Ouellette explained that pursuant to M.G.L. c. 30A, § 21(a), the Board met with Samson in executive session on March 3, 2011, and provided notice of the meeting at least 48 hours in advance to Plaintiff, who had the opportunity to attend and participate.  However, Ouellette continued, because Plaintiff decided not to attend, the Board "chose not to hear from the CoA Director at that time, but continued the meeting to April 6, 2011, to give you time to prepare."  (Exhibit S (attached to Compl.).)

Second, Ouellette explained, the Town Administrator did not act partially or unfairly toward her.  (Id.)  Third, the collective bargaining agreement that was violated was an "oral agreement made between the Town and the Union during the first bargaining session over a successor collective bargaining agreement," which provided that "the Town Administrator would meet, in the presence of a Union representative, with any individuals in the bargaining unit who might be laid off as a result of the Town Administrator's proposed budget prior to the proposed budget being released to the public during the Board's March 1, 2011, meeting."[3]  (Id.)  Plaintiff has no knowledge of

---

[3] Ouellette also referred Plaintiff to the letter in which Kennedy stated that the Board's disavowal of Plaintiff's actions was necessary to avoid the filing of a charge of prohibited practice.  (Exhibit S (attached to Compl.).)  In addition, Ouellette explained that Plaintiff's statements on February 28, 2011, "could be construed as either direct dealing between the Board and employees in a bargaining unit outside the presence of either a Union representative or the Town Administrator," or "as self-dealing by you with

any oral agreement between the Town of Adams and the Adams Clerical Unit, Local #204.  (Compl. ¶ 76.)

Fourth, Ouellette explained, the proposed budget was confidential because of the oral agreement between the Town and the Union, and because it constituted an "inter-agency or intra-agency memorand[um] or letter[] relating to policy positions being developed by the agency," which is excepted from the definition of "public record" under M.G.L. c. 4, § 7.  (Exhibit S (attached to Compl.).)  Fifth, the Board acted based on Samson's written account of the events at the Council on Aging on February 28, 2011.  (Id.)  And, sixth, a March 22, 2011, letter from Moschos to the Office of the Attorney General contained information regarding the emergency meeting held on February 28, 2011.  (Id.)[4]

On April 6, 2011, Plaintiff filed an Open Meeting Law Complaint with the Office of the Attorney General.  (Compl. ¶ 78; Exhibit X (attached to Compl.).)  On October 19, 2011, Jonathan Sclarsic, an Assistant Attorney General and presently a defendant in this action, determined that the Board did not violate the Open Meeting Law.  (Exhibit Y (attached to Compl.).)  In particular, Sclarsic found that the Board properly held an emergency meeting in light of "the harm that could result if the allegations [made against Plaintiff] were true," Board members did not engage in unlawful deliberation

_____

such bargaining unit employees, again outside the presence of either a Union representative or the Town Administrator."  (Id.)  He explained that "[u]nder the law, employers may not directly deal with employees who are members of a collective bargaining unit represented by a labor union that is the exclusive representative of such employees," and, thus, Plaintiff's actions risked liability on behalf of the Town.  (Id.)

[4] Plaintiff did not include this letter among the exhibits she attached to her complaint.

prior to the emergency meeting because only two members – less than a quorum -- participated in pre-meeting discussions, the Board was not required by the Open Meeting Law to hold an executive session, and there was no evidence that the Board released documents to the local news media prior to the emergency meeting.  (Id.)

On April 25, 2011, Ouellette, on behalf of the Board, sent Plaintiff a letter explaining the outcome of an executive session held on April 7, 2011.  (Exhibit II (attached to Compl.).)  He first explained that the matter was continued to April 7th "to accommodate your request to consult with your attorney," that Plaintiff was provided with notice of the hearing date, but that she "refused to attend the executive session" even though she was present "at the open meeting portion" of the meeting.  (Id.) Ouellette then described Samson's testimony as to the events on February 28, 2011, including her allegations that Plaintiff questioned Samson as to whether she ever had a dating relationship with Butler, that Plaintiff acted "in a hostile and aggressive manner toward" Samson, and that Samson was upset by this and felt threatened by Plaintiff's statement to her that "I don't think you want to speak to me when I'm so angry."  (Id.) Ouellette continued: "[b]ased on the foregoing evidence, the Board concluded that you acted in a hostile and aggressive manner toward Ms. Samson on Town property during Ms. Samson's workday and that your questioning of Ms. Samson as to a dating relationship was inappropriate and unprofessional."  (Id.)  As a result, Ouellette explained, "[t]he Board voted to issue you a private censure and strongly condemns your actions toward Ms. Samson."  (Id.)

Plaintiff resigned from the Board on May 9, 2012, following an election during which she was not on the ballot.  (Compl. ¶ 106; Exhibit LL (attached to Compl.)  The

newspaper article reporting Plaintiff's resignation quoted her as stating that "[t]he people have spoken, and I heard what they said . . . .   I don't think the message was for me, but I got a message from it, most certainly."  (Exhibit LL (attached to Compl.)

III.  DISCUSSION

A.  Claims Against the Commonwealth of Massachusetts Office of the Attorney General, Jonathan Sclarsic, Mirick, O'Connell, Demallie & Lougee, LLP, Corey Higgins, and Demitrios Moschos (Counts X, XI, and XIV)

Despite receiving an extension of time to do so, Plaintiff failed to file an opposition to either the motion to dismiss filed by the Commonwealth of Massachusetts Office of the Attorney General and Jonathan Sclarsic ("Commonwealth Defendants") or to the motion to dismiss filed by Mirick, O'Connell, Demallie & Lougee, LLP, Corey Higgins, and Demitrios Moschos ("Special Counsel Defendants").  That failure alone would support the allowance of both motions.  More to the point, perhaps, the court finds the arguments in support of both motions meritorious.

In particular, the Commonwealth Defendants argue that Count XIV, which asserts a due process claim -- for taking "more than six months to provide a determination" regarding Plaintiff's Open Meeting Law complaint and for inadequately investigating such complaint -- should be dismissed because Eleventh Amendment state sovereign immunity bars this claim as to the Office of the Attorney General and Sclarsic in his official capacity.  The Commonwealth Defendants also argue that Count XIV fails as a matter of law as to Sclarsic in his individual capacity because Plaintiff pled insufficient facts to support any constitutional violation and qualified immunity shields Sclarsic from liability.

For their part, the Special Counsel Defendants argue that Counts X and XI, which purport to assert violations of the code of professional conduct, should be dismissed because a violation of the Massachusetts Rules of Professional Conduct does not give rise to an independent cause of action. *See Fishman v. Brooks*, 487 N.E.2d 1377, 1381 (Mass. 1986). In addition, to the extent Counts X and XI assert legal malpractice claims, the Special Counsel Defendants argue that Plaintiff did not have an attorney-client relationship with the Special Counsel Defendants nor did she rely on their advice. *See Int'l Strategies Group, Ltd. v. Greenberg Traurig, LLP*, 482 F.3d 1, 8-10, 13 (1st Cir. 2007).

In light of Plaintiff's failure to oppose these motions, and on the merits, the court will recommend that both the Commonwealth Defendants' motion to dismiss and the Special Counsel Defendants' motion to dismiss be allowed.

B. Claim Against AFSCME Council 93 and Nadine Kennedy (Count XVII)

In Count XVII, Plaintiff asserts a substantive due process claim against AFSCME Council 93 and Nadine Kennedy ("Union Defendants"), stating that "[t]he actions of Nadine Kennedy on and around March 16, 2011, gave credence to the unlawful actions of government officials and others on and around February, 2011." (Compl. ¶ 132.) The Union Defendants seek dismissal of this claim because Plaintiff has failed to adequately state a claim upon which relief can be granted. The court agrees.

In order to state a Fourteenth Amendment substantive due process claim – as well as satisfy the requirements of 42 U.S.C. § 1983, which provides a cause of action for redressing constitutional violations – a plaintiff must, as an initial matter, establish state action. *See American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) ("Like

the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful'" (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982))); *id.* at 50, n.8 ("Where, as here, deprivations of rights under the Fourteenth Amendment are alleged, these two requirements converge." (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935, n.18 (1982))).  Plaintiff has failed to establish state action by the Union Defendants.  Granted, "under several doctrines, acts by a nominally private entity may comprise state action – *e.g.*, if, with respect to the activity at issue, the private entity is engaged in a traditionally exclusive public function; is 'entwined' with the government; is subject to coercion or encouragement; or is willingly engaged in joint action with the government." *Logiodice v. Trustees of Maine Cent. Institute*, 296 F.3d 22, 26 (1st Cir. 2002).  But again, in the court's view, Plaintiff has pled insufficient facts to invoke any of these exceptions.  *See, e.g.*, *Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1, 6 (1st Cir. 2005) ("The complaint simply does not indicate that the state 'so far insinuated itself into a position of interdependence with [defendants] that it [should be considered] a joint participant in' their actions.") (quoting *Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir. 1999))).

Even if Plaintiff could invoke one of the exceptions, Plaintiff's allegations do not rise to the level of a substantive due process violation.  Substantive due process "claims are limited to government action that, by its very nature, shock[s] the conscience . . . and [are] reserve[d] . . . for truly horrendous situations." *Freeman v. Town of Hudson*, 714 F.3d 29, 40 (1st Cir. 2013) (internal quotation marks omitted).  Here, the only allegations in the complaint regarding the Union Defendants are that Kennedy wrote a

15

letter to Higgins stating that Plaintiff told union members that they would be laid off and that the union would have filed a charge of prohibited practice if not for the Board's disavowal of Plaintiff's actions.  (Compl. ¶ 69; Exhibit T (attached to Compl.).)  To be sure, the complaint also alleges that Kennedy never responded to Plaintiff's written request that she recant the statements made in her letter and explain the basis for any charge of prohibited practice.  (Compl. ¶ 70.)  But even assuming that the statements in Kennedy's letter were false, her actions, without more, cannot be said to "shock the conscience."  Accordingly, the court will recommend that the Union Defendants' motion be allowed.

C.  <u>Claims Against the Berkshire County Sheriff's Office and Ronald Clark</u>

Although Plaintiff does not include the Berkshire County Sheriff's Office or Ronald Clark ("BCSO Defendants") in any of the counts in her complaint, she asserts in the "Facts" section that Ronald Clark's delivery of documents to Plaintiff on February 28, 2011, and March 1, 2011,

> 1) gave credibility and weight to the actions against [Plaintiff] taken by Adams government officials and others on and around February 28, 2011, 2) added to the appearance that official legitimate business was being conducted on and around February 28, 2011, by Adams government officials and others, 3) gave validity to the ethics violations alleged against [Plaintiff] by Adams government officials and others, 4) sponsored unlawful, uninvestigated, unsubstantiated, and unproven allegations against [Plaintiff], and 5) added to the portrayal that [Plaintiff] had done wrong.

(Compl. ¶ 99.)  The BCSO Defendants argue that any claims against them should be dismissed because Plaintiff failed to state a claim upon which relief can be granted. The court agrees.

As the BCSO Defendants argue, the mere service of documents, without more, does not give rise to a claim for relief.  State law specifically authorizes county sheriffs and their deputies to "serve by copy, by the attested, demands, notices and citations not required by law to be served by an officer" and provides that "their returns of service thereof shall be prima facie evidence."  MASS. GEN. LAWS ch. 37, § 12.  Contrary to Plaintiff's conclusory allegations and unsupported arguments, service in this manner does not in any way imply the approval or endorsement of the documents.  Rather, as provided by the statute, the use of a sheriff or deputy sheriff to deliver documents is meant to provide reliable evidence of service only.  On these facts, therefore, Plaintiff has not asserted a viable claim against the BCSO Defendants.  Accordingly, the court will recommend that the BCSO Defendants' motions to dismiss be allowed.

D.  Claims Against the Town of Adams, Michael Ouellette, Arthur Harrington, Jason Hnatonko, Scott Nichols, Jonathan Butler, Erica Samson, and Donald Poirot

Plaintiff asserts a number of claims against the Town of Adams, Michael Ouellette, Arthur Harrington, Jason Hnatonko, Scott Nichols, Jonathan Butler, Erica Samson, and Donald Poirot ("Municipal Defendants"), which claims can be grouped under the following headings: Open Meeting Law, First Amendment, Due Process, Whistleblower, Defamation, Equal Protection, False Light, and Retaliation.  The court will address each set of claims in turn.

1.  Open Meeting Law Claim (Count III)

The Municipal Defendants argue that Plaintiff has failed to state a claim for an Open Meeting Law violation because the law does not provide a private right of action to an individual plaintiff.  In support, they cite MASS. GEN. LAWS ch. 30A, § 23(f), which

provides that "the attorney general or 3 or more registered voters may initiate a civil action to enforce the open meeting law."  Because only Plaintiff alone pursues this alleged Open Meeting Law violation, the Municipal Defendants argue, she does not have standing to bring the claim.  In response, Plaintiff argues that "[t]he fact that the Attorney General was not diligent in their [sic] reviewing [her Open Meeting Law complaint] should provide [Plaintiff] with standing to challenge this action in this proceeding."  The Municipal Defendants have the better argument.

As explained in *Schultz v. Kelly*, 188 F.Supp.2d 38, 56 (D.Mass. 2002), which applied a previous version of the statute, "[t]he Massachusetts open meeting law . . . does not permit an individual plaintiff (or two) to file a private cause of action to enforce its provisions. . . .  Rather, the statue specifically provides that it may only be enforced 'by complaint of three or more registered voters, by the attorney general, or by the district attorney.' *Id.* (internal citations omitted); *see also Vining Disposal Service, Inc. v. Bd. of Selectmen of Westford*, 616 N.E.2d. 1065, 1067-68 (Mass. 1993).  Therefore, as the Municipal Defendants argue, Plaintiff lacks standing to pursue this claim.  *See Schultz*, 188 F.Supp.2d at 56 ("In the case at bar, there are only two Plaintiffs and neither the Attorney general nor the District Attorney have made a complaint.  As a result, Plaintiffs lack standing . . . ."); *Vining Disposal Service, Inc.*, 616 N.E.2d at 1068 ("Therefore, because of lack of standing, the open meeting claims must fail.").  Neither the minor change in the wording of the statute since *Schultz* was decided, nor Plaintiff's argument that the Office of the Attorney General was not diligent in reviewing her complaint, alters this conclusion.  Accordingly, the court will recommend that Count III be dismissed.

2. <u>First Amendment Claims (Counts XII, XV, XVI, XX, and XXI)</u>

In Counts XII, XV, XVI, XX and XXI, Plaintiff asserts claims for violations of her First Amendment rights to free speech, assembly, and association.  Plaintiff's claims, in particular, are based on the order restricting her communication with town employees (Counts XII and XVI), the changes made to the Board's Policy Guidelines Handbook (Count XV), and the order prohibiting her from entering certain town property (Counts XX and XXI).

Relying on the government-employee First Amendment retaliation cases originating with *Pickering v. Bd. of Education*, 391 U.S. 563, 568 (1968), the Municipal Defendants argue that Plaintiff did not make statements as a citizen on a matter of public concern but, rather, acted as a member of the Board and, as such, her speech was not entitled to protected status.  They also argue, citing *Wholey v.Tyrell*, 567 F.Supp.2d 279 (D.Mass. 2008), that the Board's actions constituted reasonable time, place, or manner restrictions.  In addition, the Municipal Defendants contend that qualified immunity shields them from liability in their individual capacities and that municipal liability is not available because Plaintiff has failed to allege a policy, custom, or practice which caused the alleged constitutional violations.[5]  In response, Plaintiff argues that she was acting as a citizen on a matter of public concern, that the Board's orders were overbroad, and that *Wholey* is distinguishable.

a. *Pickering*

---

[5] The court notes that the Municipal Defendants have not raised the potential defense of *absolute* immunity.  *See Acevedo-Garcia v. Vera-Monroig*, 204 F.3d 7-9 (1st Cir. 2000).

As a preliminary matter, there are several aspects of the Municipal Defendants' reliance on *Pickering* which need to be addressed.  First, the court reads Plaintiff's complaint as asserting claims based on the Board's direct restrictions on her future speech.  Accordingly, Plaintiff's claims are more accurately concerned with prior-restraint than, as was true in *Pickering*, the familiar First Amendment retaliation claims (in the form of adverse employment actions) for constitutionally-protected speech,.  As the parties should be aware, a government's burden to justify bans on future speech is greater than it is with respect to typical adverse employment actions because such bans "chill[] potential speech before it happens."  *United States v. National Treasure Employees Union ("NTEU")*, 513 U.S. 454, 468 (1995).  As explained by the Seventh Circuit,

> [e]ven if [the defendant] could fire the plaintiffs for certain speech activity, it does not follow that he should be able to restrain their expressive activity *ex ante*.  Certainly, from an individual employee's perspective, outright termination might appear the more extreme disciplinary measure.  However, purely as a matter of First Amendment freedoms, the public ramifications of a prior restraint on speech may actually be far more severe. . . .  It is therefore well settled that the government's prospective restriction on future speech is approached with a greater presumption of unconstitutionality than post-hoc disciplinary actions against specific employees for speech already uttered.

*Wernsing v. Thompson*, 423 F.3d 732, 746-47 (7th Cir. 2005) (internal citation omitted).  Second, the court must address whether and to what extent Plaintiff, an *elected official*, should be treated similarly to a *government employee*.  To the extent the court treats Plaintiff like a government employee, some version of the balancing test established in *Pickering* may still apply, albeit with the government facing a heavier burden because of the prior restraint issue identified above.  *See NTEU*, 513 at 465-68.

In *Pickering*, it must be remembered, the Supreme Court held that public employees do not automatically "relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest" simply by virtue of their public employment. *Pickering*, 391 U.S. at 568. The Court also recognized, however, that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* Accordingly, courts must "balance . . . the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* Following this and other decisions, courts undertook this analysis in two steps. "First, [a court] must determine whether the speech at issue involves 'matters of public concern.' . . . If it does not, then its First Amendment value is low, and a 'federal court is not the appropriate forum in which to review the wisdom' of internal decisions arising therefrom." *Mullin v. Fairhaven*, 284 F.3d 31, 37 (1st Cir. 2002) (quoting *Connick v. Myers*, 461 U.S. 138 (1983)). "Second, if the speech does pertain to matters of public concern, the court must . . . balance the strength of plaintiffs' and the public's First Amendment interests against the strength of the countervailing governmental interest in promoting efficient performance of the public service the government agency or entity must provide through its public officials." *Id.* (internal quotation marks omitted).

As to the First Amendment rights of *elected* officials, it is well established that such officials do not relinquish their First Amendment rights either. In *Bond v. Floyd*, 385 U.S. 116, 135 (1966), the Supreme Court rejected the State of Georgia's argument

that it was "constitutionally justified in exacting a higher standard of *loyalty* from its

legislators than from its citizens" and, thus, could refuse to seat the plaintiff in the

Georgia House of Representatives because his statements regarding the Vietnam war,

in the state's view, demonstrated that he did not sincerely swear to his oath of office.

The Court explained that

> [t]he manifest function of the First Amendment in a representative
> government requires that legislators be given the widest latitude to express
> their views on issues of policy. . . .  The interest of the public in hearing all
> sides of a public issue is hardly advanced by extending more protection to
> citizen-critics than to legislators.  Legislators have an obligation to take
> positions on controversial political questions so that their constituents can be
> fully informed by them, and be better able to assess their qualifications for
> office; also so they may be represented in governmental debates by the
> person they have elected to represent them.

*Id.* at 135-37.  Relying on *Bond*, the First Circuit had "no difficulty finding that the act of

voting on public issues by a member of a public agency or board comes within the

freedom of speech guarantee of the first amendment."  *Miller v. Hull*, 878 F.2d 523, 532

(1989).  "The 'obligation to take positions,'" the First Circuit explained, "necessarily

includes the right to vote freely on issues as they arise. . . .  The right to vote freely

enables legislators to consummate their duty to their constituents. . . .  And, as *Bond*

makes clear, this right derives from the first amendment, which protects the official

statements of legislators."  *Id.* at 532-33 (internal quotation marks and citations omitted).

Similarly, this court concludes, as a general proposition, that Plaintiff's speaking

with town employees about "Town business," as an elected representative on the Board

of Selectmen, is protected by the First Amendment.  Just as voting on issues implicates

the First Amendment, so does investigating those issues by, for example, speaking with

town employees.  Elected officials need to be informed in order to fulfill their "obligation

22

to take positions" and represent their constituents "in governmental debates." *Bond*, 386 U.S. at 136. Accordingly, an elected official's interest in speaking with town employees about town business is entitled to a high degree of First Amendment protection, at least on par with, if not higher than, a government employee's interest in commenting as a citizen on matters of public concern.

Here, in arguing that Plaintiff's speech is *not* entitled to protected status because she was acting as a *member* of the Board, the Municipal Defendants appear to be relying on *Garcetti v. Ceballos*, 547 U.S. 410 (2006), although not explicitly citing it. There, the Supreme Court held that "when *public employees* make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421 (emphasis added). As District Judge Richard Stearns later put it, *Garcetti*, "in effect, carved out a First Amendment exception for work-related speech." *Conservation Comm'n of the Town of Westport v. Beaulieu*, 2008 WL 4372761, at *4 (D.Mass. Sept. 18, 2008).

That may be so; but this court concludes that, as distinct from the speech of public employees, *Garcetti* does not apply to *elected officials'* speech, at least to the extent it concerns official duties. As explained in *Werkheiser v. Pocono Township*, 2013 WL 4041856 (M.D.Penn. Aug 8, 2013), applying *Garcetti* to elected officials would conflict with *Bond*, which reasoned that speech pursuant to a legislator's official duties *is* protected by the First Amendment. *Id.* at *8-9, 10 (collecting cases for the proposition that *Garcetti* does not apply to elected officials); *see also Miller*, 878 F.2d at 533 ("[A]s *Bond* makes clear, . . . the first amendment . . . protects the official statements of

23

legislators."); *Beaulieu*, 2008 WL 4372761, at *4 (holding that *Garcetti* does not apply to appointed officials and explaining that the First Circuit's statement in *Mullin*, 284 F.3d at 39 n.7, that it "see[s] no reason . . . why First Amendment jurisprudence in the public-employer context should not apply with equal force to the Board's removal of appointed, unpaid public officials," does not mandate the contrary because "*Mullin* . . . predated *Garcetti*, and it is clear in context that the Court's dicta reflected a more expansive reading of the First Amendment than the one adopted by the Supreme Court in *Garcetti*"). *But see Shields v. Charter Twp of Comstock*, 617 F.Supp.2d 606, 615-16 (D.Mich. 2009) (*Garcetti* applies to elected officials); *Hartman v. Register*, 2007 WL 915193, at *6 (S.D.Ohio March 26, 2007) (same); *Hogan v. Twp of Haddon*, 2006 WL 3490353, at *6 (D.N.J. Dec. 1, 2006) (same).

Indeed, there is also significant doubt as to whether the *Pickering* framework applies at all to elected officials' speech. *See Jenevin v. Willing*, 493 F.3d 551, 558 (5th Cir. 2007) ("We are persuaded that the preferable course ought not draw directly upon the *Pickering-Garcetti* line of cases for sorting the free speech rights of employees elected to state office."); *Rangra v. Brown*, 566 F.3d 515, 517 (5th Cir. 2009) ("None of the Supreme Court's public employee speech decisions qualifies or limits the First Amendment's protection of elected government officials' speech.")*, vacated by* 576 F.3d 531 (5th Cir. 2009) (granting rehearing en banc), *appeal dismissed as moot*, 584 F.3d 206 (5th Cir. 2009); *Siefert v. Alexander* 608 F.3d 974 991 (7th Cir. 2010) (Rovner, J., dissenting in part) ("Neither this court nor the Supreme Court . . . has ever held that these decisions limiting the speech of public employees can be applied to elected officials' speech, including the speech of elected judges."). The court, however, need

24

not resolve the issue at the present time because it concludes that, even if *Pickering*

does apply, Plaintiff has sufficiently alleged First Amendment claims related to the

orders.  In short, were it necessary to apply a *Pickering*-type balancing test, the court

would suggest that the Board's prior restraint orders may well have gone too far.

Simply put, the orders -- which prohibited Plaintiff, without prior approval, from speaking

with town employees about "Town business" "at any time" and from entering most town

property -- arguably "deter[ed] an enormous quantity of speech before it [was] uttered,

based only on speculation that the speech might threaten the Government's interests."

*NTEU*, 513 at 467 n.11.

> b. *Wholey*

The court agrees with Plaintiff that *Wholey*, 567 F.Supp.2d 279, which the

Municipal Defendants also invoke, is distinguishable.  There, the superintendent of the

Hull school system issued the plaintiff a "Notification of Temporary Restriction from

Property" following two "encounter[s]" with the plaintiff which resulted in the police

warning him to "keep away" from the Athletic Director.  *Id.* at 282-83.  The notification

prohibited the plaintiff "from visiting (1) the Hull High School; (2) the L street playground

fields 'during the times that any Town of Hull School Department athletic program is

using the field;' and (3) town property 'when any Town of Hull School Department

athletic program is using the property."  *Id* at 285.  The court held that "[t]hese are

narrowly tailored place restrictions designed to ensure that Plaintiff avoids contact with

[the] Athletic Director . . . .  They say nothing about the content of Plaintiff's speech, nor

do they impinge on his ability 'to speak to school officials' or 'to communicate

complaints to regulatory authorities.'"  *Id*; *see also Bl(a)ck Tea Society v. City of Boston*,

378 F.3d 8, 12 (1st Cir. 2004) ("Reasonable restrictions as to the time, place, and manner of speech in public fora are permissible, provided that those restrictions 'are justified without reference to the content of the regulated speech, . . . are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information.").

Here, in contrast, it appears that the Board's orders were not content-neutral, in that they prohibited speech about "Town business" and were not based on any articulated concern for public safety.  Rather, according to the Board itself, the orders were issued because Plaintiff had "interfered with the Town's administration by inappropriately discussing Town business with Town Department Heads and Town employees during business hours" and because, assertedly, Plaintiff had violated a collective bargaining agreement. Even so, in the court's view, the orders do not appear to have been narrowly tailored to ameliorate those concerns.  For example, the orders were not designed merely to prohibit Plaintiff from speaking with town employees during regular business hours or from discussing the town budget or other "confidential" matters.  In the end, the court has little choice but to conclude that Plaintiff has asserted viable First Amendment claims against the Board members with regard to such orders.

c. Qualified Immunity

As to the Board members' individual-capacity liability, the court concludes that qualified immunity is not available on these facts at this time.  "[T]he qualified immunity inquiry is a two-part test.  A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation."

*Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009); *see also Walden v. City of Providence*, 596 F.3d 38, 55 (1st Cir. 2010) (a right is "clearly established" if (1) "based on the clarity of the law at the time of the alleged civil rights violation, the contours of the right . . . [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right" and (2) "based on the facts of the particular case, a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights" (internal quotation marks omitted)).

As for the first prong, the court has already determined that Plaintiff sufficiently alleges a constitutional violation.  As for the second prong, the court finds that, at the time of the incidents in question, it was clearly established that prior restraints were presumptively unconstitutional, *see NTEU*, 513 at 465-68, and that elected officials enjoyed First Amendment rights, *see Bond v. Floyd*, 385 U.S. at 135-37.  Arguably, it may not have been clearly established that *Garcetti* was inapplicable to elected officials. *See Shields*, 617 F.Supp.2d at 615-16; *Hartman*, 2007 WL 915193, at *6; *Hogan*, 2006 WL 3490353, at *6.  But even under *Garcetti*, the orders stifled potentially protected speech; by prohibiting Plaintiff from speaking with all town employees about town business and from entering town property, the Board may well have prevented Plaintiff from speaking on matters of public concern, regardless of where the line is drawn between job-related speech and private-citizen speech.[6]  Accordingly, the orders at

---

[6] It cannot be true, simply by virtue of Plaintiff's position on the Board, that *all* of her speech regarding "town business" necessarily equates to "job-related" speech and, thus, would be unprotected under *Garcetti*.  In fact, the Board itself recognized that Board members could speak as private citizens about town-related issues when it admonished Plaintiff to identify herself as acting in a private, rather than official, capacity when writing letters not approved by the Board to outside agencies.  (See

issue, even under the most favorable analysis to the Municipal Defendants, appear to have been overly broad because the prohibitions were not limited to Plaintiff's official-capacity speech; as such, an objectively reasonable official should have known that the orders likely violated Plaintiff's First Amendment rights.

>    d.  Municipal Liability

In addition, the court is unpersuaded by the Municipal Defendants' argument that municipal liability is unavailable as a matter of law.

> Municipal defendants may be held liable under § 1983 for actions taken pursuant to an official policy or an official custom that violated the Constitution. . . .  A plaintiff can establish the existence of an official policy by, inter alia, showing that the alleged constitutional injury was caused . . . by a person with final policymaking authority.

*Walden v. City of Providence*, 596 F.3d 38, 55 (1st Cir. 2010) (internal citations and quotation marks omitted).

Here, the Board clearly had final policymaking authority with respect to the orders entered against Plaintiff.  As explained by the Supreme Judicial Court, "[t]he members of a board of selectmen are publicly elected officials, G.L. c. 41, s 1.  Their constituents are entitled to the unfettered exercise of their judgment on matters of policy." *Labor Relations Commission v. Bd. of Selectmen Dracut*, 373 N.E.2d 1165, 1170 (Mass. 1978); *see Walden*, 596 F.3d at 56 ("Whether an official has this requisite level of specific policymaking authority is a matter of state law.").  Accordingly, the Town of Adams may be held liable for the official actions taken by the Board to prohibit Plaintiff from speaking with town employees and entering town property.  *See Cronin v. Town of*

---

Exhibit B (attached to Compl.).)

*Amesbury*, 895 F.Supp. 375, 383 (D.Mass. 1995) ("[I]f plaintiff establishes that the Board of Selectmen or an officer who possesses final authority to establish policy, like a Town Manager, violated plaintiff's rights to procedural due process, the town is liable.").[7]

### e. Handbook Changes

The court concludes that Plaintiff has failed to allege a First Amendment claim in relation to the changes to the Board's Policy Guidelines Handbook.  The slight changes to the Handbook highlighted by Plaintiff did not ban her from speaking with town employees and, therefore, did not constitute a prior restraint.  Rather, the Handbook merely required Board members to "[l]imit questions of Town staff to those of a general nature" and to direct "specific questions requiring detailed information or written documentation . . . to the Town Administrator."  Moreover, in contrast to the orders entered against Plaintiff, the Handbook restrictions were content-neutral and were directed to all members of the Board.  Nor can Plaintiff state a claim under a retaliation theory because the Handbook changes cannot be considered an adverse employment action.  In fact, the previous version of the Handbook -- which instructed Board members to "[l]imit contact with specific Town staff," direct questions of town employees "only to the Town Administrator, Town Counsel, Administrative Assistant to the Board of Selectmen, or Department Heads," and copy the Town Administrator on all correspondence – appears to have been more restrictive than the later version.

---

[7] The claims against the Town of Adams necessarily encompass the official-capacity claims against the Board members and, therefore, it was repetitive for Plaintiff to assert claims against both.  *See Willoughby v. Town of Tisbury*, 750 F.Supp.2d 374, 379 (D.Mass. 2010) ("A claim against the Selectmen in their official capacities is merely another way of pleading a claim against the Town itself, which Plaintiffs have already done.").

For all these reasons, the court will recommend that the Municipal Defendants'
motion to dismiss be denied as to Counts XII, XVI, XX, and XXI but granted as to Count
XV.

    3.  <u>Due Process Claims (Counts I, II, III, V, and IX)</u>

In Counts I, II, III and V, Plaintiff asserts that her due process rights were
violated, presumably by the Board, based on the following actions: depriving Plaintiff of
her elected position through the orders that banned her from town buildings and from
speaking with town employees without a hearing or evidence (Count I); providing only
two hours' notice of the emergency meeting, which prevented her from preparing or
seeking the aid of legal counsel (Count II); failing to inform her of her rights with regard
to the emergency hearing (Count III); and failing to explain how she interfered with
collective bargaining or conducted direct-dealing before entering the orders (Count V).
Count IX, however, merely asserts that the Board's orders were unlawful but fails to
allege a due process violation; accordingly, the court will recommend that it be
dismissed.

The Municipal Defendants argue that Counts I, II, III and V fail as a matter of law
because (a) Plaintiff has not alleged what protected interest was violated, (b) the Board
provided notice and opportunity to be heard at every juncture, (c) the Board's actions
were not unlawful and did not violate Plaintiff's constitutional rights, and (d) Plaintiff
failed to avail herself of post-deprivation remedies.  The Municipal Defendants also
argue that qualified immunity shields them from individual-capacity liability and that
municipal liability is not available because Plaintiff failed to allege a policy, custom, or
practice which caused the alleged constitutional violations.

In response, Plaintiff argues that her protected interests were her elected, paid position as a member of the Board, her right to hold public office, and her right to free speech and assembly.  She argues as well that, on balance, the process offered by the Board "was unsatisfactory" and that it should have utilized an outside group to make findings before taking such drastic action.  In addition, as to post-deprivation remedies, Plaintiff argues that "[i]t would [have been] both impractical as well as impossible for [her] to receive any relief or a fair hearing from the group that so unreasonably took actions against her."

As the First Circuit explained, "[t]he basic guarantee of procedural due process is that, 'before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard at a meaningful time and in a meaningful manner.'" *Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 13 (1st Cir. 2011) (quoting *Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir. 1990)).  Accordingly, "[t]o state a valid procedural due process claim, a plaintiff must (1) 'identify a protected liberty or property interest,' and (2) 'allege that the defendants . . . deprived [her] of that interest without constitutionally adequate process.'" *Air Sunshine, Inc. v. Carl*, 663 F.3d 27, 34 (1st Cir. 2011) (quoting *Gonzalez-Droz*, 660 F.3d at 13).

Here, the Municipal Defendants argue that the Board did not deprive Plaintiff of any rights but, rather, simply required her to comply with the existing rules for communicating with town employees and the terms of the collective bargaining agreement.  As discussed, however, the Board's orders prohibiting Plaintiff from speaking with town employees and visiting town property were quite broad and, thus, plausibly support Plaintiff's claim of a deprivation of her First Amendment rights.

"Whether the deprivation was, in fact, justified is not an element of the procedural due process inquiry." *Gonzalez-Droz*, 660 F.3d at 13. "In procedural due process claims," the Supreme Court explained, "the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). In short, the court concludes that Plaintiff has sufficiently alleged a deprivation of her liberty interest in free speech.[8]

As to the adequacy of the process accorded Plaintiff,

[i]n order to determine both when a pre-deprivation hearing is compulsory and what process is due, an inquiring court must balance a myriad of factors, including the private and public interest involved, the risk of an erroneous deprivation inherent in the procedures employed by the state, and the likely benefit that might accrue from additional procedural protections.

---

[8] As to Plaintiff's assertion of additional property and liberty interests, the court seriously doubts that she had a property interest in holding elected office. *See Velez v. Levy*, 401 F.3d 75, 86-87 (2d Cir. 2005) (collecting cases for the proposition that an elected official "lacks a constitutionally cognizable property interest in her elected office"); *see also Snowden v. Hughes*, 321 U.S. 1, 7 (1944). Plaintiff also seems to argue that she had a liberty interest in holding office. Even if Plaintiff did have such an interest, *see, e.g., Flinn v. Gordon*, 775 F.2d 1551, 1554 (11th Cir. 1985) (the plaintiff "certainly had a constitutional right to run for office and to hold office once elected, [but] he had no constitutional right to win an election"), the court will analyze her procedural due process claim with regard to her First Amendment liberty interest because, in the court's view, this interest is stronger and was more directly deprived than any potential liberty or property interest she may have had in holding her elected position. *Cf. Monahan v. Romney*, 625 F.3d 42, 47 (1st Cir. 2010) ("'If he resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily and thus cannot establish that the state deprived him of it within the meaning of the due process clause.'" (quoting *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 173 (4th Cir. 1998)).

*Gonzalez-Droz*, 660 F.3d at 13 (citing *Mathews v. Elridge*, 424 U.S. 319, 335 (1976)).

Balancing these and other factors, the court concludes at this nascent stage of the

litigation that Plaintiff has sufficiently alleged that she did not receive adequate process.

The Board only notified Plaintiff of the emergency hearing two hours beforehand.

In addition, the notice included no information regarding the substance of the allegations

leveled against her.  "The right to be heard contemplates adequate notice 'reasonably

calculated, under all the circumstances, to apprise interested parties of the pendency of

the action and afford them an opportunity to present their objections.'"  *Collins v. Marina-*

*Martinez*, 894 F.2d 474, 480 (1st Cir. 1990) (quoting *Mullane v. Central Hanover Bank &*

*trust Co.*, 339 U.S. 306, 314 (1950)).  Although each case presents distinct facts, the

process provided here has generally been held to be insufficient.  *See Gonzalez-Fuentes*

*v. Molina*, 607 F.3d 864, 892 (1st Cir. 2010) ("Yet the petitioners here were not given any

explanation until the hearing itself.  By failing to give the petitioners any pre-hearing

information as to why their [electronic supervision program] status was being revoked,

Puerto Rico deprived them of 'a chance to marshal the facts in [their] defense and to

clarify what the charges are, in fact.'" (quoting *Wolff v. McDonnell*, 418 U.S. 539, 564

(1974)); *Collins*, 894 F.2d at 481 ("Here, notice of the hearing was so abrupt and

uninformative as to be constitutionally deficient. . . .  Absent suitable notice, the

'opportunity' for plaintiff to be heard was a charade."); *Pizarro Calderon v. Chavez*, 327

F.Supp.2d 131, 135 (D.P.R. 2004) ("Under *Wolff*, an inmate facing potential loss of good

time credit must be provided not only a hearing before a disciplinary committee, but also

advance notice, of not less than 24 hours, of the claimed violation, as well as a written

statement of the fact finders as to the evidence relied upon and the reasons for the

disciplinary action taken."); *Cifarelli v. Village of Babylon*, 894 F.Supp. 614, 621 (E.D.N.Y. 1995) (employee only provided notice "a 'few hours" prior to termination was not afforded sufficient notice "to have made a timely request for a hearing").

To be sure, the Municipal Defendants argue that it was necessary for the Board to take immediate action to avoid potential liability on the part of the town.  Kennedy's letter does state that the Board's disavowal of Plaintiff's alleged statements avoided the filing of a prohibited practice charge against the Board.  At the emergency meeting, however, the Board could have opted to disavow what it considered to be inappropriate statements made by Plaintiff to town employees, without entering any orders against her until she had more of an opportunity to prepare a response.  That procedural flaw lies at the center of Plaintiff's claim.

The Municipal Defendants also argue that Plaintiff could have asked the Board to re-address the orders entered on February 28, 2011, and that her failure to avail herself of this post-deprivation remedy bars this claim.  It is simply too early in the litigation for the court to entertain such arguments.  While the complaint and its attachments indicate that the Board held a hearing in executive session on April 7, 2011, and that Plaintiff failed to attend this hearing as well, it appears that the hearing was conducted for the purpose of deciding whether to censure Plaintiff for her alleged conduct.  Looking at the facts in a light most favorable to Plaintiff, the court will not assume that if Plaintiff had attended this hearing and presented convincing evidence, the Board would have been inclined to negate its previous orders.  Moreover, although the Board did provide detailed responses to Plaintiff's written request for an explanation of its actions, this did not occur, it appears, until *after* the Board entered orders against her without providing, as she

alleges, a meaningful opportunity to be heard.  Accordingly, based upon Plaintiff's strong

First Amendment interests and the apparent inadequacy of the process accorded her,

the court concludes that she has sufficiently alleged procedural due process claims

against Ouellette, Harrington, Hnatonko, and Nichols in their individual capacities.[9]

The court also concludes, as to the Municipal Defendants' qualified immunity

argument, that it was clearly established that Plaintiff had a due process right to be heard

at a meaningful time and in a meaningful manner.[10]  Furthermore, the court believes that,

on these facts, an objectively reasonable official would know that the Board's actions

violated Plaintiff's due process rights.  *See e.g.*, *Collins*, 894 F.2d at 481.  Accordingly,

qualified immunity is not available at this time.

The court also rejects the Municipal Defendants' argument that municipal liability

is unavailable.  As discussed above, the Board had final authority with respect to

decisions of town policy.  Therefore, the Town of Adams may be held liable for the

--------

[9] To the extent Plaintiff also asserts her claims against the other individual Municipal Defendants, Plaintiff has not alleged that they were in any way responsible for a due process violation.  *See, e.g.*, *Gagliardi v. Sullivan*, 513 F.3d 301, 309 (1st Cir. 2008) ("[N]either Mayor Sullivan nor any other Lawrence official was responsible for the decision to decertify the Board, and they accordingly had no duty to provide Gagliardi with notice or an opportunity to be heard.").

[10] The court does not agree with Plaintiff, however, that an outside group was required to conduct the hearing, nor does the court express an opinion as to what specific procedures would have been required at the hearing.  *See Newman v. Burgin*, 930 F.2d 955, 961 (1st Cir. 1991) ("The Constitution does not mandate an opportunity to present proofs, arguments, and refutations to *any* group of people with the power to influence an important decision about life, liberty or property . . . .  The Constitution does not require every procedural protection that might help; it simply requires that a private person have a basically fair opportunity to convince the *decision maker* . . . .").

decision of the final policymakers (the Board) to deprive Plaintiff of her First Amendment rights without constitutionally adequate process. *See Walden*, 596 F.3d at 55.

In all, the court will recommend that the Municipal Defendants' motion be denied as to Counts I, II, III and V, to the extent they assert due process claims against Ouellette, Harrington, Hnatonko, Nichols, and the Town of Adams, but granted as to Count IX.

### 4. Whistleblower Claim (Count VI)

In Count VI, Plaintiff asserts a claim against Donald Poirot, the Adams Chief of Police, for violating the Massachusetts Whistleblower statute, MASS. GEN. LAWS ch. 149, § 185. The Municipal Defendants argue that this claim should be dismissed because it can only be maintained against an "employer" and Poirot was not Plaintiff's employer. The Municipal Defendants also argue that Plaintiff was not an "employee" under the statue, no "retaliatory action" was taken, her actions were not protected by the statue, and she failed to comply with the statue's notice requirement. In response, Plaintiff states that "it is arguable that [her] employer was the Town and that Chief Poirot was 'another employer with whom the employee's employer has a business relationship,'" under M.G.L. c. 149, § 185(b). For its part, the court finds the Municipal Defendant's first argument persuasive, *i.e.*, that Poirot was not Plaintiff's employer, and therefore sees no need to address the remaining arguments.

"The Massachusetts whistleblower statute prohibits public employers from retaliating against employees who participate in any of the act's enumerated protected activities," *Welch Ciampa* 542 F.3d 927, 942 (1st Cir. 2008), such as "disclos[ing], or threaten[ing] to disclose . . . to a public body an activity, policy or practice of the

employer, or of another employer with whom the employee's employer has a business relationship, that the employee reasonably believes is in violation of a law," M.G.L. c. 149, § 185(b)(1).  As the First Circuit has explained, however, "[t]he Whistleblower statute permits only an 'employer' to be sued, not individual supervisors."  *Welch*, 542 F.3d at 943 n.7 (quoting *Bennett v. City of Holyoke*, 230 F.Supp.2d 207, 221 (D.Mass. 2002)).  Poirot cannot be considered Plaintiff's "employer," nor, for that matter, even her supervisor.  *See* M.G.L. c. 149, sec. 185(a)(2) (defining "employer" as "the commonwealth, and its agencies or political subdivisions, including, but not limited to, cities, towns, counties and regional school districts, or any authority, commission, board, or instrumentality thereof").  Because Plaintiff only brought this claim against Poirot, it is subject to dismissal.  *See Bennett*, 230 F.Supp.2d at 221 ("The plain language of the statute suggests that the Massachusetts Legislature intended to exclude claims brought under the Whistleblower Statue against individual employees, even when acting in their official capacities."); *see also Welch*, 542 F.3d at 943 n.7.  The court will therefore recommend that Count VI be dismissed.

5.  Defamation Claims (Counts VII and VIII)

Plaintiff asserts defamation claims against the Director of the Adams Council on Aging, Samson (Count VII), as well as the individual Board members, Ouellette, Harrington, Hnatonko, and Nichols (Count VIII).  Seeking dismissal of these claims, these Municipal Defendants together argue that the statements made by Samson and the Board members were not defamatory or false and that, even if they were, Plaintiff has not sufficiently alleged "actual malice."  The Municipal Defendants also contend that the statements made by the Board members are conditionally privileged and that Plaintiff

37

has not alleged any facts indicating that the privilege was abused.  Plaintiff responds by pointing to the numerous exhibits attached to her complaint, which, according to her, demonstrate the validity of her claims.

"To prevail on a claim of defamation, a plaintiff must establish that the defendant was at fault for the publication of a false statement regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either caused economic loss or is actionable without proof of economic loss."  *White v. Blue Cross & Blue Shield of Mass., Inc.*, 809 N.E.2d 1034, 1036 (Mass. 2004); *see also Stanton v. Metro Corp.*, 438 F.3d 119, 124 (1st Cir. 2006).  Furthermore, "a public official [cannot] recover for 'a defamatory falsehood relating to his official conduct unless he proves that the statement was made with actual malice – that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'"  *Rotkiewicz v. Sadowsky*, 730 N.E.2d 282, 287 (Mass. 2000) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)).

As an initial matter, it is not clear which of Samson's statements Plaintiff alleges are false.  Within Count VII, Plaintiff alleges that "Samson provided a written statement to the effect that Samson *imagined* that [Plaintiff] spoke with Council on Aging employees about the town budget.  This is false.  [Plaintiff] never made any such statements." (Compl. ¶. 120 (emphasis added).)  In the "Facts" section of her complaint, however, Plaintiff alleges that she did make "separate brief comments about the Adams Town Administrator's recommended FY2012 budget to three employees of the Adams Council on Aging: the part-time Administrative Assistant, the Director, and one of the Town staff members of the Council's social day program."  (Id. ¶ 38.)  In addition, Plaintiff admitted in her complaint filed with the Office of the Attorney General, which she attached to her

complaint in this action, that she "asked the part-time staff member whether she had seen the proposed town budget" and told her "[y]ou won't be happy," as well as stated "[t]o the full-time staff . . . that sweeping changes are recommended in the budget and that [Plaintiff] found them totally unacceptable." (Exhibit X (attached to Compl.).) According to Plaintiff's own allegations, therefore, she did speak with Council on Aging employees "about the town budget," which means that this portion of Samson's written account cannot be false. Accordingly, reading all of Plaintiff's allegations together in a light most favorable to her, the court infers that Samson's allegedly false statements were that Plaintiff revealed "confidential information" about the town budget and explicitly told employees that their positions were being cut.

Even assuming that these statements were defamatory, which is hard to conclude, Plaintiff has not sufficiently alleged "actual malice" on Samson's part. In Count VII, which is directed only against Samson, Plaintiff merely alleges that

> actual malice is proven by the hasty and improper way the Adams Selectmen dealt with [Plaintiff's] alleged ethics infraction in not properly proving any ethical infraction did occur. Furthermore, actual malice can be imputed in the Selectmen's retaliatory behavior against [Plaintiff's] truth seeking and 'whistle blowing actions,' namely, doing her duty as an elected official to represent her constituents.

(Compl. ¶ 121.) Clearly, these allegations do not in any way indicate that *Samson* acted with "actual malice." Moreover, as described, Plaintiff's and Samson's accounts are remarkably similar, in that they both allege that Plaintiff spoke with Council on Aging employees about the proposed budget in some manner and intimated that the budget was not favorable to the employees. In light of these similarities, and without more factual content which would allow the court to draw a more nefarious inference, *see*

*Iqbal*, 556 U.S. at 678, the court cannot infer that Samson made any statement at issue "with knowledge that it was false or with reckless disregard of whether it was false or not." *See Oberg v. City of Taunton*, --- F.Supp.2d ----, 2013 WL 5347437, at *17-18 (D.Mass. Sept. 25, 2013) ("Plaintiff cannot rely on 'actual malice buzzwords,' and must plead facts to support his legal conclusions.") (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2010)).

As for the Board members, Plaintiff equates the "charges/allegations made against [her] on February 28, 2011" with defamatory statements on their part.  Again, however, the court cannot infer from the facts alleged that the Board members made their statements with "actual malice."  At best, Plaintiff alleges in Count VIII that the Board "failed to conduct their due diligence" and that "[t]he fact that the selectmen never engaged in a fact-finding session or properly held a hearing regarding these supposed violations is indicative of their willful disregard for the truth."  (Compl. ¶ 122, 123.)  But, as is clear from other portions of the complaint, the Board did hold a hearing.  While the hearing accorded Plaintiff may not have been adequate from a due process perspective, as discussed above, this does not suggest that the Board knew that the allegations were false or made them with reckless disregard for the truth.  Moreover, a lack of "due diligence" is not the grist of "actual malice."  On these facts, therefore, the court can only infer that, at most, the Board may have mistakenly believed Samson's account.

Accordingly, because Plaintiff has not sufficiently alleged "actual malice," the court will recommend that both Counts VII and VIII be dismissed.

6. Equal Protection Claim (Count XIII)

In Count XIII, which Plaintiff labels "Violation of Equal Protection Clause," she asserts that

> [t]he only recourse available to [Plaintiff] for the removal of the orders against her was through the Office of the Massachusetts Attorney General, whereby the orders of the Adams Selectmen would be negated if the Adams Selectmen violated the Massachusetts Open Meeting Law with relation to the emergency meeting of February 28, 2011.

(Compl. ¶ 129.)  Although it is not clear against whom this claim is asserted, the Municipal Defendants argue that it should be dismissed nonetheless for failure to state a claim.  In support, the Municipal Defendants argue that, to the extent Plaintiff asserts an unlawful discrimination claim, she has not alleged any facts from which it can be inferred that she was subjected to differential treatment as a result of her membership in a protected class.  They also argue that Plaintiff has failed to assert a "class of one" claim because the complaint contains no allegations that she was treated differently than similarly situated individuals.

Plaintiff failed to address Count XIII in her opposition to the Municipal Defendants' motion to dismiss; that again would be sufficient to dismiss the claim.  More importantly, the court agrees with the Municipal Defendants that Plaintiff failed to sufficiently allege differential treatment, which failure is fatal to her claim under either theory.

"The Equal Protection Clause of the Fourteenth Amendment 'contemplates that similarly situated persons are to receive substantially similar treatment from their government.'" *Harron v. Town of Franklin*, 660 F.3d 531, 537 (1st Cir. 2011) (quoting *Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004)).  "At a minimum, in order to provide fair notice to the defendants and state . . . facially plausible legal claim[s] . . . [plaintiff] had to identify [her] putative comparators and put forth some facts showing the existence of

41

malice or some other impermissible consideration." *Id.* (internal quotation marks and citation omitted). And under a "class of one" claim, a plaintiff need not allege that the selective treatment was based on an "impermissible consideration," but she still must allege that she was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Freeman v. Town of Hudson*, 714 F.3d 29, 38 (1st Cir. 2013). While both types of claims include "similarly situated" requirements, "class-of-one claims require an extremely high degree of similarity between [the plaintiff] and the persons to whom [she] compare[s herself]." *Id.*

Here, Plaintiff has not identified the "similarly situated" individuals, nor has she included any facts regarding how she was treated differently than them. For example, Plaintiff has not alleged that other Board members made similar statements to town employees without suffering comparable consequences. Accordingly, the court will recommend that Count XIII be dismissed.

### 7. False Light Claim (Count XVIII)

The Municipal Defendants seek dismissal of Count XVIII, which asserts a claim for false light against the Board members, on the ground that the Massachusetts Supreme Judicial Court has not recognized such a claim. *See ELM Med. Lab., Inc. V. RKO Gen., Inc.*, 532 N.E.2d 675, 681 (Mass. 1989) ("The only invasion of privacy the plaintiffs assert is 'putting plaintiff[s] in a false light.' This court has not recognized that tort and does not choose to do so now."); *see also Ayash v. Dana-Farber Cancern Inst.*, 822 N.E. 2d 667, 681 n.16 (Mass. 2005) ("We have not adopted an interpretation of G.L. c. 214, § 1B, that would give rise to claim of false light invasion of privacy claim."). This court agrees. *See Rared Manchester NH, LLC v. Rite Aid of New Hampshire, Inc.*, 693

F.3d 48, 54 (1st Cir. 2012) ("Where, as here, a party asserting a state-law claim eschews an available state forum in favor of a federal forum, it scarcely can be heard to complain when the federal court follows existing state precedent and refrains from blazing a new and more adventurous jurisprudential trail.").  The court will therefore recommend that Count XVIII be dismissed.

       8.  <u>Retaliation Against Public Official Claim (Count XIX)</u>

      Finally, in Count XIX, which Plaintiff labels "Retaliation Against Public Official," she alleges that

> [a]fter [she] went to the Adams Prudential Committee meeting on February 28, 2011 and informed the Committee that Butler and Harrington were not authorized to be at that meeting, nor did they have the authority to offer the Forest Warden's property, they reacted by calling an emergency meeting and trying to embarrass, harass, slander, and effectively get [Plaintiff] to quit. Their actions were a clear violation against decency and due process.

(Compl.)  The Municipal Defendants argue that this claim should be dismissed because the allegations do not give rise to any viable claim; in addition, they argue that there are no facts which support Plaintiff's conclusory allegation that Butler and Harrington called the emergency meeting because of her statements at the Prudential Committee meeting and that, in fact, this allegation contradicts other allegations in her complaint.  Once again, Plaintiff failed to address this count in her opposition.

      As an initial matter, it is unclear what Plaintiff's specific claim is or its legal basis. Unlike with many of her other claims, Plaintiff did not list any statute in this count.  And to the extent Plaintiff intends to assert a common-law retaliation claim, the court does not believe such a claim is viable; Plaintiff was not a traditional "employee" and she has not alleged that her "employment" was "terminated contrary to a well-defined public policy."

*Wright v. Shriners Hosp. For Crippled Children*, 589 N.E.2d 1241, 1244 (Mass. 1992)

("We have recognized exceptions to [the] general rule [that at-will employees may be

terminated for almost any or no reason] . . . when employment is terminated contrary to

a well-defined public policy.  Thus, [r]edress is available for employees who are

terminated for asserting a legally guaranteed right (e.g., filing workers' compensation

claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that

which the law forbids (e.g. committing perjury).") (internal quotation marks omitted)).

Moreover, the court agrees with the Municipal Defendants that Plaintiff's complaint

makes clear that the Board called the emergency meeting because of the Council on

Aging incident not because of the statements Plaintiff made at the Prudential Committee.

Aside from her single conclusory allegation in Count XIX, quoted above, Plaintiff's

complaint contains no other facts indicating that the Board was motivated by the

Prudential Committee incident and, therefore, any claim based on this allegation is not

plausible.  Accordingly, the will court recommend that Count XIX be dismissed.

## IV.  CONCLUSION

For the reasons stated, the court recommends that the following motions be

ALLOWED in full: the Commonwealth Defendants' motion to dismiss (Document No. 30),

the Special Counsel Defendants' motion to dismiss (Document No. 18), the Union

Defendants' motion to dismiss (Document No. 52), and the BCSO Defendants' motions

to dismiss (Document Nos. 11 and 13).  The court also recommends that the Municipal

Defendants' motion to dismiss (Document No. 35) be ALLOWED as to Counts III, VI, VII,

VIII, IX, XIII, XV, XVIII and XIX but DENIED as to Counts I, II, III, V, XII, XVI, XX and XXI

to the extent they assert claims against Ouellette, Harrington, Hnatonko, Nichols, and the

Town of Adams.  Accordingly, if this Report and Recommendation is accepted, Ouellette,

Harrington, Hnatonko, Nichols, and the Town of Adams would need to file answers to

Counts I, II, III, V, XII, XVI, XX and XXI, whereas the remaining defendants would be

dismissed from this action.[11]

DATED: January 10, 2014

/s/   Kenneth P. Neiman
KENNETH P. NEIMAN
U.S. Magistrate Judge

---

[11] The parties are advised that under the provisions of Fed. R. Civ. P. 72(b) or Fed. R. Crim. P. 59(b), any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within fourteen (14) days** of the party's receipt of this Report and Recommendation.  The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection.  The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation.  *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980).  *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.